and on behalf of the Appalachian Cross Athlete, Mr. Thomas I. Mathis, on behalf of the Appalachian Cross Athlete, Mr. James S. Harkness. Good morning, ladies and gentlemen, and Mr. Mathis. Thank you. Good morning, Justices. My name is Tom Mathis, and I'm here with Tracy Cannon. The two of us represent Control Solutions, and we're the two trial lawyers on this case. And we are pleased to be here, and we really appreciate this opportunity. I have a demonstrative, as far as a housekeeping matter, I do have one demonstrative. I did show it to Mr. Harkness. I don't believe there's any objection to it, so when I come to it, if I may put that up, I would appreciate that. I think one of the particular reasons that we appreciate this opportunity for our argument is that, as Your Honors, I think recognize we've got two institutions here that are quite noteworthy and quite a part of our jurisprudence, of our business world, of our everyday life, and one of them is settlement. And the interest in parties resolving settlements, resolving disputes on their own, before or during a controversy. I think the other one is the jury system and the importance of the jury system and the expectation of litigants that their cases will be decided pursuant to the law, the law of the case as the trial judge gives it. I don't mean to overstate it, but there's a gravity to these two institutions. There's a very, very long-standing public policy behind both of these institutions in the state of Illinois and elsewhere. And it is embedded in our jurisprudence, embedded in our business world, embedded in our everyday life, as far as settlements, and the jury system is part of our jurisprudence and our court system. And it's just, I take great pride in both of these institutions. And unfortunately, both of these institutions suffered during the course of this trial. Counsel, I mean, the seminal issue is the construction of 408. Whether or not these negotiations were in fact settlement negotiations that would then be governed by Rule 408, right? I mean, that's what we're talking about. Those considerations, those public policy considerations you alluded to, are embodied in 408, correct? Yes. Okay. So why does this fall within 408? A trial judge felt that it did not fall within 408. Yes, Your Honor. There are basically three standards here that we need to focus on. One is, was there litigation at the time of the communications? Is it litigation or simply a dispute? Well, the trial court at the time of the granting of the denial of our motion to eliminate ruled that since it predated the filing of the lawsuit, therefore, the motion to eliminate would be denied and these documents would be admitted. There is absolutely no case law support for that being a bright-line test as far as 408. Well, what about on the subsequent motion? There's two potential, there are two standards. One is, is there a dispute? And there's also decisions that we have cited to Your Honor where the courts talk about an apparent difference of opinion and in particular the Davis case. And we also cite to Your Honors the Bradney case, which is a tense sort of case, that even if there is doubt as far as 408, the better practice is to exclude it. There is, as far as a factual inquiry here, there is no question that there was a dispute. There's an apparent difference at a minimum. And what happened here is that on June 5th of 08, Alexis told Control Solutions to stop the process of making these controllers. So, they asked for cancellation costs and that's played in Exhibit 77. The next week, the next week Control Solutions communicated to Alexis that the amount due for cancellation costs is $3.7 million. This contract had a 30-day net pay clause. There's no question about it. That was the term, 30 days net pay. They didn't, Alexis did not pay it. Alexis was already in breach. So, at that moment, they had stopped the work. We told them that $3.7 million is owed, 30 days of labs, no payment. Now, what does Alexis do next? Alexis says, tell us about the number of completed controllers and inventory. That communication signaled that Alexis was taking a different road, was not focusing on the NCNR, non-cancellable, non-returnable provision, and was focusing on completed controllers, inventory, and stop, neither one of which is a term in the contract of the parties. Well, let me just stop you there and break this down. You're not saying that when the defendant asked what your costs were, that at that point, those were settlement negotiations. That's not your position, is it? The initial, the 6508, Exhibit 77, no. Okay. So then, as you said, there's another communication back to the defendants, and then they ask to clarify something. Is it a tech to clarify something, bring it within the realm of a dispute in 408 settlement negotiations? No. Well, I appreciate the question. The first communication that we are saying that is a 408 communication is the September 5th 08 communication. And the one before was not a clarification. They asked for information that had absolutely nothing to do with the contract of the parties. These are business people. There were no lawyers involved. So I think we need to look at this from the perspective of business people. And how did the business people react to this? There was a stop work, there was communication of what was owed, and 30 days elapsed, no payment. And instead, now there's a focus by elections on something completely different that has nothing to do with the contract of the parties. And instead of paying, and instead of saying I need more time or something, they are asking for information that is inconsistent. That's certainly to business people. And let's not forget the context of this. The relationship between these parties, as far as even the making of the contract, was a long, arduous process. And then it was finalized. There's a signed document from Alexis. But the context of this between business people, when there's a stop work, we communicate how much is owed, they don't pay, and then they want something else. Well, they want something else. Isn't it possible that they want something else because they are business people? They know that Control Solutions is the only one, the single source for this particular product, that there may be other orders. And maybe something else can be done with those materials. So they're business people looking at possibilities. Your Honor, they had a contract with the Army. Our contract is between two private companies. They had a separate flip contract with the Army where they're going to make a sizable amount of money. That was terminated. That is between Alexis and the Army. We were not a party to that contract. But what I'm saying is as business people, they know that Control Solutions is the only one providing this particular, I can't remember what it's called. It's a controller. Okay, controller. And so they're going, okay, they want 3.7. Let's talk about what might be happening so that we can have a full picture because they had to report to the Army, didn't they? That's between them and the Army. And the fact of the matter is they have an obligation to us to pay within 30 days. When they didn't pay within 30 days, they were already in breach. Does it have anything to do with the fact that you had an obligation or your clients had an obligation to produce on May 7th and nothing happened until May 23rd, May 28th, June, you know, everything, and nothing happened as the contract said? They went in 100-unit increments as opposed to 200-unit increments per shipping? That certainly wasn't communicated to us. That certainly wasn't the jury's finding. The jury's finding on liability, and this was a rather contested case, but as far as jury instructions, it was one of the few times that we actually didn't have a contentious situation. All of the liability and the interrogatories, as far as the jury instructions, verdict form, came out that control solutions performed and that Alexis was the one and only breaching party. And if your Honor is to look at the September 5th communication, which is Exhibit 53, the FedEx Exhibit 53, and what does it say? It says we would like a speedy resolution. Control solution itself is saying speedy resolution. They are concerned that they're not getting paid, there is a breach, there is a stop, and they want a speedy resolution. It says we're a small business, and a cancellation of this magnitude is a significant impact on our financial status. Control solutions is clearly signaling that they are worried, that they're concerned, and they would like it wrapped up quickly. But they still want $3.7 million, so there's nothing about a settlement involved. No, I would like to differ, Your Honor. In the September 5th email, the speedy resolution, it's an offer, it's for $93,000 plus 15% of the 3.6, which is about $545,000. So it is not the full contract price. What control solutions is saying, we want a speedy resolution, and we're willing to take much less for a speedy resolution, $93,000 plus $545,000. That is clearly an indication that control solutions is concerned based upon the actual communications between the parties, and there's an apparent difference between the parties. And, as far as this was a settlement discussion, settlement communication, actually, Alexis confirms that in a number of ways. First of all, within days, they communicate to the Army that they have had settlement negotiations with Alexis. But that's between the two of them. Well, but it's an admission that there were settlement negotiations. No. The form that Alexis submitted to the Army noted that there had been settlement negotiations between control solutions and Alexis, and a settlement agreement had been reached. Now, the fact of the matter is that there was no settlement agreement that had been reached, but this is Alexis saying within two weeks, three weeks, that they have negotiated in good faith. That's a contemporaneous communication by Alexis that, according to them, they've already had settlement negotiations with Alexis. So we've got both parties, in effect, saying one party is saying speedy resolution, Alexis is saying we've already negotiated, and we, in fact, have a settlement agreement, which is not true. We have, later on, Alexis coming back with a settlement offer of its own, where they want a release. And so clearly, if you look at the context from the beginning to the end, the parties themselves, the business people, were looking at this as settlement discussions. Counsel, rather than spend all your time on this issue, I understand the position is that these invoices, these communications, fell within the purview of 408. What about the defendant's argument that even if they should have been privileged under 408, their admission was harmless? That this information came out in testimony, out of exhibits, that the jury heard it anyway. So how do you respond to that, that even if it was aired, it was harmless there? If I may put up the board, I think I can answer that. I think you're correct. You can take judicial notice of the fact that we can't read it. I can't see that at all. Sure. It's right here. It is also in our opening brief at page 18. It's much easier to read there. So if Your Honors would bear with me, I'll look at page 18. And this was about harmless error. I mean, this went to the core of the verdict. The $93,000 and the 15 percent, if I may stand over here, came from that 95 communication by control solutions. Is that the only place it came from? As far as the 93 and the 15 percent being together in this format. 15 percent, was that mentioned elsewhere? 15 percent was not. $93,000 was mentioned elsewhere in one of the communications. But as far as this being together, this is the only place where it was in this format. And what happened, as far as the jury is concerned, we, of course, had a voir dire. We asked, all sides asked the jury if they would follow the law as given by the court. They all answered yes. They were sworn in and they said that they would follow the law. And then we have the jury instructions. And jury instruction number one says that you've heard the evidence and now I'm going to give you the law. And the law is controlled, contained in the jury instructions. And you cannot pick out some instructions and disregard others. You are supposed to follow the law as stated in these instructions. If your honors would bear with me, in jury instruction seven, it describes the contract and the controllers. And it is, jurors may continue further. You may proceed. Thank you. Jury instruction 11, the full value of the contract with Alexis to which it is entitled. The full value of the contract. There was only one damage model in the instructions. There was no objection to it. Alexis did not ask for an alternate instruction as far as damages. The law of the case was full value of the contract. Now what happens, every liability issue, question is decided in favor of control solutions. And then what did the jury do? They totally disregarded the verdict form. So are you asking for a jury nullification here? I'm sorry? Are you asking for a jury nullification argument? What we're saying in effect is that the law of the case was given by Judge Webster as contained in the instructions. Those instructions were clear. And there's one damage model. And given that the jury answered yes on all of the liability questions, at that point, the task of the jury, And the jury had two possibilities after they found liability for control, found in favor of control solutions. They could give us all of the money, or I suppose they could give us zero, that we didn't prove it. Why couldn't they accept the defendant's theory, Alexis' theory, and the argument posed by counsel? Well, first of all, when we put in the evidence on the damages, it was basically a very little cross-examination. There was no, what I would call, any kind of damaging cross-examination or anything. The $93,000 had nothing to do with full value of the contract, as noted in the jury instructions that I just read. And they didn't follow the jury's instructions. Well, in your mind, it didn't. But what about in the jury's mind? Because they heard both sides. They heard witnesses McKee, Jamison, Hoover, Shea, Martinez, and Kell, and I can't remember who was with whom, but they all testified as to their participation in both the negotiation of the contract and what happened thereafter, which included a $93,000 figure, correct? Somebody mentioned it in testimony. It was for settlement purposes, and only for settlement purposes. No, in testimony, I'm talking about. For settlement purposes. Well, then why did it come in in testimony? Because our motion on limiting was denied. As to the documents. And that was in the documents. And what the jury did that's even more egregious, they came up with this 50% lost potential investment income. There was no evidence on that. There's nothing in controversy on it. There was no instruction on it. There was no lost potential investment income law. The four words are critical here. Lost, whatever that means. Potential actually sounds future-oriented. Investment income, no evidence, no law, totally invented by the jury. And then instead of having a number for A and then a number for B and subtracting B from A, they actually added this lost potential investment income. So as far as the prejudice, it allowed a continuous focus on this $93,000 number because of the settlement communications. They were calling them settlement communications. And that's the September 5th. And the only place they could have found that lost investment, lost potential investment, whatever, I'm sorry. Well, lost potential. Was from that September 5th document? The expression lost potential investment income is not mentioned in that document. Well, there is a 15% figure. There's a 15%. And I believe that the word is profit. A 15% profit as a percentage of sales. But lost potential investment income is nowhere in documentary evidence or testimony evidence. And instead of using the number that Mr. LeBlanc testified and then deducting the saved expenses as the jury was instructed to do by Judge Webster, they picked this $93,000 that was a settlement number. And if the $93,000 was in any of the documents, it was. It was based upon the settlement offer that was originally made. All of the references to $93,000 had their genesis in the context of the settlement discussions. And this was highly prejudicial because that is the number that was picked by the jury. And then they also picked this 15% lost potential investment income. That cannot be harmonized with the evidence or the jury instructions. Since I have a final follow-up question, you've gone over your time, but we appreciate your answering the questions. It appears to me that while the parties are not disputing the formation of a contract, your argument is almost sort of implying that the terms and the damages are not controverted in this case. Clearly, the jury was presented with two conflicting theories as to when the contract was formed, the terms of the contract. As I recall, Judge Webster at the end even made the comment, indeed, the jury accepted defendant's theory of liability. She says the jurors found the contract between these parties included the terms and conditions containing the purchase order of defendant, which included a provision for cancellation for convenience as a flow down from the government contract. So clearly there was a number of terms and issues and factual questions for the jury to resolve. You're almost presenting the argument that there was nothing in controversy here. I don't know if that's accurate. I hope I wasn't doing that. I was not trying to do that. This was a highly contested case on all levels. And at the end of the day, though, we have a signed document from Alexis. The NCNR, non-cancellable, non-returnable, was communicated by Control Solutions from the first time the quote was requested at every opportunity, and it ended with Alexis signing a letter saying it's NCNR. NCNR means just that. And you had terms and conditions of Control Solutions that Alexis's website would not be controlling here. Based upon the jury instructions, and I have to go back to jury instructions, if Alexis wanted an alternate damage model that it was only for finished goods, they could have asked for one. They didn't. And I think the fact that they didn't ask for one is very telling here. And there's a model, and we cite in our brief, there is a model jury instruction on that very point. So they took a risk, we took a risk, went for full value or nothing. But I don't think anybody expected that instead of all or nothing, that the jury would go off the instructions, pick a number that had nothing to do with a contract that were settlement negotiations, and then plus add 15% for this lost return that was neither in the evidence or the instructions. If they had added 15% in whatever they called it to the balance of the purchase price, that the 15% wouldn't have been a problem then, would it? Yes, it wouldn't have been, Your Honor. Why? Because it did not follow the law of the case. There was nothing in the jury instructions that indicated that a 15% was a proper consideration for the jury. The jury was supposed to figure out what was the lost opportunity, less expenses. Less expenses. We proved that up on a basically uncontested basis. There's very little cross-examination. Mr. Lebon testified to that. Here is the value of the full contract, less saved expenses. Those were the two concepts. Those were the only two concepts that were permissible for the jury to consider under the instructions of the law of the case, as it was given on an uncontested basis. There may not have been a lot of cross-examination, but the defendant, Alexis, did present a case, didn't they? They presented evidence? Of course. They presented evidence.  Witnesses. Let's go to witnesses. I don't believe that they presented evidence on the lost, on the total value of the contract, less expenses. I don't know. They did not. Bottom line, is it your position that because of the documents that were erroneously admitted, that that's why the jury did not follow the model that you submitted in the instructions and came up with this 93,000 plus 15%? Exactly. That's exactly what we're saying. Okay. All right, thank you. Counsel, you'll have an opportunity for response or rebuttal. Thank you very much. Appreciate it. Is it Mr. Harkness? Yes, Your Honor. Good morning. Good morning. Justices, counsel, may it please the court. My name is James Harkness. I represent Alexis, the defendant, appellee, and prosecutor. The trial team is here. This is from McCluskey and Mrs. Friedland. This case is about a contract dispute and whether and how it was performed. We're here because despite Alexis' attempts to have the contract defined via pretrial motions, a motion for directed verdict, post-trial motion, control solutions, as we noted in our brief, and the trial court wanted the jury to take those two issues. They wanted to consider the contract process, the terms and conditions, and any damages. So does, I mean, is it Alexis' basic position that there was no contract or that the contract occurred at a later time than control solutions believes it did? Alexis' position is that there was a contract and that it was formed prior to the order acknowledgement that control solutions argues. Okay. What happened was- That order acknowledgement is the last, if I could just define some terms in my head, the order acknowledgement is that last document? It's the last. It says NC, that non-cancel, non-return, and the $93,000 figure? Is that the contract that control solutions, you believe control solutions is presenting? That's not the $93,000 figure. The order acknowledgement and resulting letter that my opposing counsel suggested to you that we signed. September 5th? I'm sorry? What was the date of that? That was May 20th. Okay. The date shipment was due after they had already missed shipment. May 7th. So what happened was the Army issues a public notice and it says we want these controllers and then Alexis asked control solutions for a quote. And in response, what they get is an email saying we understand this is a DX rated project for a controller and they knew it was for the government. Those are two pieces of information that Alexis had not given them. They knew exactly who this was for and what was going on. And then when we received a quote, it had control solutions terms and conditions because they were already in a contract with the Marines. They knew that this was a sole source clause. This goes back to the Civil War. Termination for convenience occurs because the U.S. military purchases parts and when a war stops, they don't want to be stuck purchasing all this stuff. So they have a workout process. And it dates literally back to the Civil War where they say tell us what your finished goods are. We'll pay for it. Whatever you made, we'll pay for it. Whatever your working processes, we'll pay for it. And whatever your raw materials are, we'll pay for it, but nothing more. So the DX is what gives this away in terms of the discussions between the two parties? Yes, DX rating means priority basis and it's a military code. Right. Control solutions knew what it was. But in response to their request for a guarantee in their quote, they didn't get it. What we gave them was a purchase order. This is a battle of the forms under the Uniform Commercial Code, which is why we sought a ruling that the order acknowledgment was unconscionable. We said no. These are going to be our terms and conditions. You know what they are. They're incorporated. And control solutions had a choice at that point. Accept, counter, or reject. They accepted. Our purchase order specifically said in two different places confirmation required by email. And they emailed us back the order confirmation. Angelica Martinez, the purchase order clerk at the time later in accounting, emails back and says please accept this order. Please accept this as confirmation of your PF confirmation, the word used in the purchase order. And she attached a shipping schedule. And that shipping schedule had very specific dates. It required 200 units per week. And they didn't ship them. What they did do was tell us in all of these communications, which I can outline for you, that packaging is in process. Logistics is in process. We're working on it. We're going to have 200 units for you in a week. And then they wait until May 20th when they're already 400 units behind. And they say, oh, by the way, here's this order acknowledgment. You have to sign it or we won't ship you the product. Now, that language mirrors the one communication in this case. This case was all about email. The chief technology officer at the time, Mr. McKee, who was, I believe, the CFO at one point, chief financial officer, he's the guy talking to the salesman, Roy Kell. Roy Kell was the guy talking to our client, Mr. Jameson and Alexis. He writes to Roy Kell on April 24th. Before May 20th, a month before, he says, oh, hey, please make sure the purchase order wasn't confirmed because I don't like their terms and conditions. Now, the testimony at trial was that they read the terms and conditions as part of their due diligence process. All witnesses agreed about that. They're very thorough. Then Mr. McKee writes to Roy Kell and he says, let me know immediately if you accepted those because we've got to change them. We've got to do something about it. Let me interject. I think it's fairly obvious there was some conflict in terms of the meeting of the minds, the communications, what I think sort of a disconnect between some of these emails. But tying it into the critical issue that they raise, how does this tie into whether or not there were settlement negotiations in this case and when those settlement negotiations took place and whether or not they were within the purview of 408 and should have been excluded from the jury's consideration? Can you address those issues? Yes. You all ask some excellent questions. And I think the genesis to begin with starts with counsel's statement that this had nothing to do with the contract. The jury had to determine which contract applied. And it determined that this was a military contract, that Control Solutions was our subcontractor and it was subject to termination for convenience. So we get to the contract process documents or the settlement documents. Well, when he says the September 15th email and he's talking about that as a settlement negotiation, tell us why the trial judge's ruling was correct. The trial judge's ruling was correct because what happened was on the motion in limine the trial judge said, wait a minute, there's a number of documents here. This $93,000 piece, this 15% comes from a number of different places. It was disclosed to third parties. It was meant to be disclosed to the military. And there's a question of fact here. So I'm not going to exclude it in limine. I'm going to require the parties to put on witnesses, establish a foundation before I decide whether to admit the documents. And plaintiff's going to be free to object. But in considering the hurdle we had to meet to lay the foundation and get those documents in as business records and as in compliance with the contracts, and I want to answer that question for you, the trial judge overruled their objection and said, these aren't settlement documents. And that was what she said before trial and what Judge Webster said after trial. She said, there's a mountain of evidence here, and these simply aren't settlement documents. Why are they not settlement documents? Number one, the Army canceled under the termination for convenience clause and told Alexis to notify the subcontractors on May 28th, 2008. That's plaintiff's trial exhibit 76, page two. We did that. June 5th, by the way, they mentioned a dispute. This was not 30 days. Thirty days hadn't happened yet. Not only had we not gotten any parts under the shipping terms, but 30 days had elapsed. June 5th, within days, Alexis sends the plaintiff, pursuant to the purchase order, an e-mail the government requested for cancellation costs. This is the government's form letter. We gave them the letter. We attached it to the e-mail. And that has the breakdown. That has what the government's asking for. And then that day, Roy Kell, control solution salesman, writes back that they stopped shipment. That's plaintiff's trial exhibit 77. We cross-examined him on that. And his testimony at trial was that he stopped shipment in order to, quote, make certain they stopped making parts, end quote. The jury heard that. The jury heard Mr. Lebon get up and say, yeah, we made 100 parts, but we reallocated everything else. There were no costs. That was their cost saving. They made the money elsewhere. They put them into different parts for different clients. They heard Roy Kell say, we made certain we stopped making the parts. Then, June 12th, plaintiff's trial exhibit 82. And August 26th, plaintiff's 55. Alexis makes clear that it is requesting an audit to fill out a form for the government. Now, one of the things that my opposing counsel mentioned was plaintiff's trial exhibit 94, which is settlement proposal inventory basis. You won't be able to see it from there. But number one, it was never admitted at trial. Number two, that is for public reporting burdens. And there's a number of instructions here. And the military has an itemization of how to break it down and what to pay. That's what they did. And control solutions submitted the information we asked for under the contract that the government asked for in their letter. And we sent it to the government. They knew we were going to be disclosing this to third parties. Those aren't settlement discussions. That's an audit. Who called the Army as a witness? Who called the Army, the two representatives from the Army? I don't recall. Was it defense or? I don't recall, but both were there. I can answer that for you in remodel. All right. Because it was Mr. Mantle's position that whatever was going on between the Army and Alexis is none of his concern. And you're saying it's definitely his concern because you need to get this information from them in order to fill this out. So I'm just wondering who would have called the Army because. Well, I apologize. I interrupted you. That's all right. Go ahead. There may be an answer forthcoming. We called the Army. We called two witnesses. I recall that. They were contracting specialists, and they testified that the termination for convenience clause is always in the contract and it's nonnegotiable. Well, you can't get around it, can you? No, you cannot. It's mandated. You're dealing with the Army. You've got to accept it, right? Well, as the Army made clear, the Army is very rigid. You follow their process, and that's all there is to it. And the Army's forms are very rigid. Just to try and summarize without going through a long litany, your position is the contract gets canceled by the Army. Obviously, you have to communicate it to the other side and ask for the cost. You're saying at that point you were simply trying to pin down and determine what they were going to be claiming. Is that essentially correct? That's absolutely right. And in the most succinct terms, the Army has these FAR termination for convenience clauses. They are required to flow down or, in other words, be incorporated into the subcontracts so that everybody down the chain, when termination happens, follows this process. Right. So obviously you're going to have a different opinion in terms of the legal efficacy of the September 5th email and the invoice in December. Was there ever anything that would have qualified as a settlement communication under 408 at all there? The trial didn't exclude anything. No, but even if you disregard the September 5th email, which followed the whip, finished goods, raw material, even if you disregard that, the jury had a number of pieces of testimony and documentary evidence. So that ties into your Hermas error argument, right? Yes. Okay. So you're saying the jury obtained this information aside from that email? Correct. Can you succinctly tell – he disputed that vehemently. He got up with his charge and said, no, that's not right. So you now tell us what information they got from these sources other than the email and the invoice. Mr. Labon had been cross-examined. That was the individual the plaintiff put on to say, you know, what parts do we have? And what they did was they literally filled the trial court with boxes of invoices and receipts. And we didn't go through them one by one because we would have been there longer than the week and a half we were already there. But they asked him a series of questions. Were there these investments in product? And the cross-examination was brief because Mr. Labon, thank goodness, told the truth. We said, what happened to all that stuff? He said, I reallocated it. I used it all in other products. So they didn't have any costs. That was their cost savings. The jury, the testimony was we made $93,000 worth of parts, 100 parts at $930 apiece. Everybody said that that was the price. That's what the invoice said. They then held those documents up in due diligence to a third-party investor, Corinthian Capital, who was called. I called him. Actually, his transcript was read because he was unavailable. But he said, I went through due diligence. We were looking to buy this company for approximately $40 million. It was a substantial investment. There were very big banks involved. And he was told there were three lots of production and 100 each. Both were late, number one, with the contract documents. Both were light because there were only 100, not 200. And most importantly, the 100 parts that Control Solutions got a verdict for, because the jury said, okay, you got 100 parts you weren't paid for, that wasn't produced until September, way after, way after the contract was canceled. Who verbally mentioned the term 15%? 15% was— I don't care what it was of, but who said 15%? 15% was in the email exchanges that Counsel's not contesting. That wasn't—well, that's not verbal. 15% is in the invoice. And the testimony by Mr. McKee was, yeah, I sent this email, and I suggested the revision to the invoice. I wanted two line items because I wanted it to be clear. And the second line item was 15% lost profits. That's an excellent question, and I want to get to that. Mr. Kell then takes that email and sends it to accounting, and the accounting department turns it into an invoice, books it as an accrued receivable, testifies, not that it's settlement documents, but that it's an accrued receivable. And then Kell, the salesman, sends an email to Jamison. May I finish? Yes. Sends an email to Jamison, and what he calls it at that point is not lost profit. He calls it lost margin. And I want to tell you where the 15% for the jury came from. He calls it lost margin. It gets turned into lost investment income. Here's why. And it was lost profit someplace else, or potential lost profit someplace else? It was lost profit on the invoice, lost margin in Kell's email to Alexis. And then during closing argument, the rebuttal closing, I want to be very clear about this. The counsel for planning said, here's the closing argument, there had been a lot of investment in this product. And it goes on. And what they said was investment was mentioned six times in the record in closing arguments 1624 to 1626. Investment in upfront costs, investment in an expensive product, investment in expensive development, investment in employees, and, quote, we had already invested. The jury had a choice. It had $93,000, 100 parts of 93,000. They agreed that the terms and conditions of Alexis applied. And they said, okay, we've got this invoice. It's been booked as a receivable. So we agree that there's 93,000 in parts. And we agree that there's this investment or lost margin. And what they did was they wrote, may I approach? Yes, yes. They simply wrote 93,000 and then 50%, and they used counsel's term of phrase, investment income. That's where it came from. This was no secret. When we had our opening argument, we said we didn't breach. Control Solutions breached. Mr. Jameson said when he got that order acknowledgment, it was a gun to his head because it was going to put him out of business. He had no choice. That was on the ship again. We were already behind him due to the government. He said he signed it. He told the truth. He said, we don't believe we did anything wrong, but you know what? We did get 93,000 from the government. And if you think that they're entitled to anything, we don't believe they are, but give them 93,000. That was our opening argument, and it was our closing argument. So that $93,000 figure, it comes from evidence, but a lot of what the jury ultimately did, it appears, might have come from argument by both counsel. No, I think the jury had a basis in the due diligence documents to the investor. They had a basis in the invoice. They had a basis in the testimony of the parties. They had a basis in the presentation of Mr. Lebon. And then it was just simply a different use of phrase by counsel. What you're saying is there's all these other places where it came into evidence, but the last thing the jury heard was in closing argument the use of the word investment. That's the last thing the jury heard.  Right, from plaintiff's counsel. Not the very last thing, but after all the evidences, during closing argument, they heard the use of the word investment. But they also heard testimony saying that they posted that amount. Oh, I'm not disputing that, but the word investment appears on this document instead of profit or margin or other phrases because that's the last thing they heard it called. Correct. And the accrued receivable was considerably more than, the 15% was considerably more than $13,950. It was, but the jury disagreed with their interpretation. I understand that, but when we talk about that accrued receivable, it was $535,000 something. Correct, almost $600,000. What it was was $93,000 and then 15%. That was on the balance. Right. So they chose a different figure based upon, in your position, the evidence they heard as well as, obviously, the argument that came last from the plaintiff. Any other questions? No. Just that. All right. Thank you very much. Thank you. Mr. Matches. Thank you very much. The question or the statement that Your Honor made about Judge Webster did not exclude anything, and I think that's very telling because there are, she didn't say this is settlement, this is not, and there are certain provisions in 408 that allow some things to go in, and none of that was done by Judge Webster. She allowed everything in, and that, we say, is trial error. Counsel, let's talk about that for a second, though. We haven't yet, surprisingly. Is it the standard of review here in abuse of discretion? Yes, Your Honor. Which, under many cases, has been defined as no reasonable person would agree with the trial court's ruling. That's a fairly deferential standard of review, isn't it? Well, but when we couple, if that was the only issue, and let's say this was a bench trial. If it was a bench trial, we wouldn't be here. But it wasn't a bench trial. It was a jury trial. And when you couple that with the verdict form and the verdict instructions and the prejudice and the harm that accrued from that, and I will differ with Mr. Harkness. And maybe my client didn't do it as well or as carefully because the invoice, for example, my client was frustrated that there had been no payment yet and no progress. So in order to prompt some attention and some movement, they issued an invoice. But that invoice was part and parcel of the settlement dialogue. So the investment point that Mr. Harkness made, I mean, the instructions are clear. Arguments of counsel are not evidence. The jury is bound by the evidence and not by arguments. As far as the $93,000, as I said, the invoice was a part of the settlement discussions. The 93, wherever it appeared, was a part of the settlement process. And this is the one place where the 93 was tied to the 15%. And even where the 93 appeared, it also appeared with other numbers. Is it possible? Now, this is, you know, just a question based upon what I've been hearing. Is it possible that, you know, the jury looks at that invoice, which seems not like a negotiable issue. This is what you want. And they see that document and they consider that a business document, as did apparently Judge Webster. And they accept that as this is your, this is what you believe you're owed at that particular time. Not in negotiation, but this is what you're owed. My answer to your honor would be this. I have to go back to the jury instructions. And I think the jury instructions are key here. Because the jury instructions set forth the law of the case. And I respectfully submit that under the jury instructions of this case, which were uncontested, the jury could not do that. They simply could not do that. When it says the full value of the contract, less expenses, and it talks about a calculation. When you look at the damage, the damage instruction, just bear with me if you would, your honors. In calculating, this is instruction number 13. The word calculating is in two places. In calculating control solutions damages, you should determine that sum of money that will put control solution in as good a position as it would have been if both control solutions and Alexis had performed all of their promises under the contract. And then it talks about direct damages. And again, calculate the amount of this gain by determining the value of the contract that control solutions did not receive, subtracting a save because of breach. And let's not forget that the jury actually found, after a contested, maybe even heated trial, that control solutions performed its obligations, was not in breach, and Alexis was in breach. So the jury, the verdict from control confirms that control solutions performed what it was supposed to perform or had a valid excuse for not doing so. And it was Alexis that was one and only, the damage. As far as the army and termination for demands, that is a separate contract between Alexis. We're not a party to that. It's irrelevant to this. And I go back to the 30 days. Once they stopped, the 30 days, when they told us to stop, the 30 days started. And the payment was due in 30 days. They did not do that. I mean, this is, your contract was non-refundable, non-returnable or something, non-cancellable, non-returnable. Correct or not. But ultimately, you knew this was a government contract. And that doesn't make any difference? It does not. And, Your Honor, if Your Honors would be kind enough to look at Plaintiff Exhibit No. 42. This is two emails from Alexis, from Alexis to the army. And Alexis, in Plaintiff's Trial Exhibit 42, says, Our contract with Control Solutions is non-cancellable and non-returnable. And it came up in two time frames. One on May 19th, and then actually, the army was already considering, the army was considering canceling this contract even before it was finalized between Alexis and Control Solutions. And the army is telling Alexis that we may very well be cancelling this. And Nancy Wilkin, from Alexis, writes back to the army, No parts can be cancelled. Our cost will be the total contract. This is Alexis saying this at two different time frames. And even before the 5-21, this is Exhibit 47, Plaintiff Trial Exhibit 47, on 5-21-2008, Alexis, on their stationary, signed, net 30 days, all orders are non-cancellable and non-returnable. And this NCNR did not come about in the last minute, from the very first time that Alexis asked us for a quote. NCNR was always a part of all of the quotes of the communications from Alexis, but Control Solutions was concerned. They didn't want to question about it, and they wanted this letter. And it said, Alexis' letter had to be signed by Alexis and CNR. And Alexis' website, or what they told you to go back to in the earlier documents concerning the contract, talked about the fact that this was a government contract. Not that this was a government contract. They talked about that where there is a government contract, there are certain convenience termination rights. The Alexis Control Solutions contract was not a government contract. This was a contract between two private companies. Nevertheless, you are the sole supplier. So, I don't know if that... Which means that anybody who comes to you for this part has to have a government contract. Well, if something is used for that. Right. But, we were not contracting with a government company. I understand. We were contracting with a private company. I think the fact that we're the sole supplier, with all due respect, I don't think it means anything. So, I think what is... And I think one of the problems here is that the council really never answered the questions about why this wasn't a settlement. And I got to go back to September 5th. Speedy resolution. Obviously, Control Solutions was worried. They had a dilemma. There was a dispute already. They weren't paid on time. It's a significant impact on a small business. And they were putting what they wanted in a sizable manner. And the fact that this was allowed in. And then, the related follow-up documentation, with nothing being kept out. And then, they had found themselves into the verdict form. That's why we're asking for a reversal, Your Honors. Thank you. Thank you very much. Mr. Harkness, do you want to say anything about your motion? Our motion to prosecute, Your Honor? Yes. We'll give you a couple minutes if you want to. You don't have to. I'm just asking if you want to. Okay. Okay. Justices, this was a trial under the Uniform Commercial Code. And if you remember law school, there was no passion or prejudice in the jury. This came down to credibility. They knew. They heard testimony that Mr. Kell wanted to change the contract terms. They knew he set it up via email with his salesman, Mr. McKee, with Mr. Kell, rather. They knew that they waited a month until a shipment was due. They knew he only produced 100 parts. They knew that they reported that to an investor. And they knew that Control Solutions had no lost expenses or products because they were shipping them to the Marines at the same time. That testimony came in. The Army did suggest that they were going to cancel, but they specifically told us to keep producing until the termination for convenience. And the purchase order, plaintiff's Exhibit 6, specifically references the government contract number, and it says this PO is governed by the terms and conditions found at our website. And those incorporated the termination for convenience clause. Control Solutions accepted that. We filed a motion for summary judgment, and this is our cross-appeal, which, if this verdict is overturned, if you agree that you should supplant your judgment on the credibility of the witnesses, if you believe that you're in a position to say, no, Mr. McKee was actually telling the truth and the jury got it wrong, then that motion would still be pending. It would not be moot, as Judge Webster ruled. Under the unconscionability provision, a last-minute demand after missing performance and on-the-date due is not valid. You cannot modify that way. It puts the parties in an unfair bargaining position. That's the law. It was denied without prejudice and reserved for trial. A plaintiff, in their brief, objected and demanded the issue be taken with trial. That's how we got to the question of unconscionability and interpreting the contract. Then in a motion in Lemony, the court specifically held that it would rule, quote, after evidence is in, just like a motion for directed verdict, and prior to releasing the case to the jury. That's the record. That's the judge's quote. That didn't happen. The jury came back and filed for Alexis. They gave control solutions. What we told them would be appropriate. So, procedurally, the court didn't follow its ruling, and it's not moot if you overturn this verdict. That is why it is not appropriate to have a new trial on just damages. It's appropriate, if this is overturned, to have that dispositive motion addressed. Thank you, counsel. Thank you very much. And thank you both for the arguments. Very enlightening, exciting, and we'll have a decision in due course. We'll stand in recess to prepare for our next argument.